CASE NO: 2:07-CV-98-MEF

RECEIVED

2007 APR 11  A 10: 56

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CEDRIC SMITH, Pro Se,
Plaintiff,

VS.

HONORABLE RICHARD FRANK ALLEN,
Commissioner, Alabama Department Of Corrections
(A.D.O.C.), et al.,
Defendant(s).

PLAINTIFF'S OBJECTION TO THE MAGISTRATE
JUDGES'S RECOMMENDATION AND BRIEF IN SUPPORT
OF OBJECTION

CEDRIC ALLEN SMITH
PLAINTIFF, Pro se,

CEDRIC ALLEN SMITH # 15509
G.K. FOUNTAIN CORR. CENTER
FOUNTAIN 3800
ATMORE, ALABAMA 36503-3800

## Statement of the Case

This is a civil rights action brought under 42 United States Constitution (U.S.C.) §1983, Civil Right(s) Complaint, by a prisoner (inmate), listed and named within this said instant cause of action, as a Plaintiff, in which is incarcerated within the physical control, custody and security of the Alabama Department Of Corrections.  In November 18, 1993, the Plaintiff, as a first-time criminal offender was sentenced, by the Circuit Court Of Shelby County, Alabama, Eighteenth (18th) Judicial Circuit to serve a total prison term of Twenty (20) years, for the criminal offense of Theft Of Property I, (First (1st) Degree), a Class B Felony, as defined, pursuant to the Criminal **Code Of Alabama**, 1975, as amended, Title §13A-8-3.

In February, 2007, the Plaintiff, hereby filed a Civil Rights Complaint, pursuant to Title 42 United States Constitution (U.S.C.), §1983, thereby challenging, the constitutionality of **sub-section (e)** of the **Code Of Alabama**, 1975, as amended, Title 14-9-41. Pursuant to the Federal Rule(s) Of Court-Federal Rule(s) Of Civil Procedure (Fed. R. Civ. P.), Rule 65, the referenced Application For A Temporary Restraining Order And/Or In The Alternative Application For A Preliminary Injunction.

1

**Statement of the Fact(s)**

Pursuant to the intent of the Alabama Law Makers (Legislative),

as adopted within the written content(s) of Act No. 80-446, as codified,

within the written content(s) of the **Code Of Alabama**, 1975, as amended,

Title §14-9-41, thereby intended  for each prisoner(s) (inmate(s)) who shall

hereafter be convicted of any offense against the law(s) of the State Of Alabama

and is confined, in execution of the judgment or sentence upon any conviction,

in the penitentiary or at hard labor for the county or in any municipal jail for a

definite or indeterminate term, other than life is to be classified, solely based,

on his or her behavior, discipline, and work practices and job responsibilities.

The **Code Of Alabama**, 1975, as amended, Title §14-9-41, sub-section

(e), thereby states, in pertinent part, as hereby follow(s);

"**Provided, however, no person may receive the benefits of correctional incentive time if he or she has been convicted of a Class A felony or has been sentenced to life, or death, or who has received a sentence for more than Fifteen (15) years in the state penitentiary or in the county jail at hard labor or in any municipal jail. No person may receive the benefits of correctional incentive time if he or she has been convicted of a criminal sex offense involving a child as defined in Section §15-20-21(5). No person may be placed in Class I if he or she has been convicted of an assault where the victims of such assault suffered the permanent loss or use or permanent partial loss or use of any bodily organ or appendage. No person may be placed in Class I if he or she has been convicted of a crime involving the perpetration of sexual abuse upon the person of a child under the age of 17 years.  The court sentencing a person shall note upon the transcript to accompany such prisoner the fact that he or she has been sentenced as a result of a crime that forbids his or her being classified as a Class I prisoner.**"

The State Of Alabama Department Of Corrections, classifies a prisoner

(inmate), in which has been convicted of a Class A Felony criminal offense or

sentenced to a term of more than Fifteen (15) years, in Class IV Status,

regardless of the fact of whether such prisoner (inmate) has proven through his

record of conduct (institutional behavior) that he has faithfully observed the rules

for a period of time to be specified, without a legitimate penological purpose

and solely on the bases of the Plaintiff's sentence exceeding a term of Fifteen

(15) years, he or she is automatically categorically denied and/or prohibited,

from receiving any benefit(s) of correctional incentive time deductions,

from their sentence, pursuant to the **"Cook's Substitute"**, known as

**Senate Bill #107,** in which contains the **"McDonald Amendment"**, as written

within the written content(s) of the Alabama Correctional Incentive Time

Deductions Act, as codified, by the **Code Of Alabama**, 1975, as amended,

Title §14-9-41, at **sub-section (e).**

However, pursuant to the **Code Of Alabama**, 1975, as amended,

Title §14-9-41, **sub-section (c)(4),** thereby defines Class IV, as hereby

follow(s):

**"Class IV is for prisoners not yet classified and for those who are able to
work and refuse, or who commit disciplinary infractions of such a nature
which do not warrant a higher classification, or inmate(s) who do not
abide by the rule(s) of the institution. Inmate(s) who are classified in this
earning class receive no correctional incentive time. This class is generally
referred to as "flat time" or "day-for-day". Any inmate shall remain in this
classification for a minimum period of 30 days before being eligible for
Class III.**

This class is designated as specified, for prisoner(s) (inmate(s)) not yet classified and for those prisoner(s) (inmate(s)) who are able to work and refuse, or who commit disciplinary infraction(s) of such a nature which do not warrant a higher classification, or prisoner(s) (inmate(s)) who do not abide by the rule(s) of the institution. Therefore, a prisoner (inmate) who is able to work and does, does not commit disciplinary infraction(s) of such a nature which do not warrant a higher classification and a prisoner (inmate) who abides by the rule(s) of the institution, in which is classed, as a Class IV Prisoner (Inmate) is erroneously classed, and thereby being denied and/or prohibited, from being classified, as intended, by the Lawmakers (Legislature) of the State Of Alabama, for such prisoner (inmate) has not been classified based on the prisoner's (inmate's) behavior, discipline and work practices and job responsibilities, as prescribed by section (b), as written within the written content(s) of the **Code Of Alabama**, 1975, as amended, Title §14-9-41, **sub-section (b).**

The Plaintiff, argues that, his constitutional right(s) to receive due process and equal protection of the law, as guaranteed and secured, under the governing provision(s) of the Fourteenth (14th) Amendment of the United States Constitution has been violated, because he having a seven (7) year clear institutional behavior record that has exhibited good institutional behavior, discipline, work practices and job responsibilities, in which does work, have not committed any inmate disciplinary infraction of such a nature that do not warrant

4

a higher classification, nor has the Plaintiff failed to abide by the rule(s) and regulation(s) of any institution, for over a seven (7) year period of time, while serving his Twenty (20) year sentence, however, the Plaintiff is held, by the Alabama Department Of Corrections, to the same standard, as prisoners (inmate(s)), in which receive all of the benefit(s) of the Alabama Correctional Incentive Time Deduction(s) to include time deduction(s), from their sentence(s), as imposed to be served, by trial judges that have bad institutional behavior, discipline, poor work practices and lack of responsibility to their assigned institutional job(s).  While, according to the Alabama Department Of Corrections, Classification Division, the Plaintiff is eligible to receive certain benefits, in which, a Class I Prisoner receives to the exclusion of receiving any time deduction, from the Plaintiff his sentence, as imposed, by the trial judge.

The Plaintiff, hereby assert, how is it that he having a seven (7) year clear institutional behavior record, free of any prisoner (inmate) disciplinary infraction(s), be held indefinitely to the same standard and/or class, as a prisoner (inmate) that receives beneficiary treatment and time deductions, from their sentence(s) to be served, as imposed, by the trial judge(s), in which, such prisoner(s) (inmate(s)) have exhibited bad institutional behavior, discipline, poor work practices and lack of responsibility to their assigned institutional job(s). The Plaintiff, also asserts that, the Alabama Department Of Corrections has positive inmates, in which receives absolutely no time deductions, from their sentence(s), as imposed, by trial judges, in the same class, as prisoner(s)

inmate(s) who are disciplinary problem(s), poor work practices and poor job responsibilities that actually receives time deduction(s), from there sentences, as imposed, by trial judges.

On November 18, 1993, the Plaintiff was convicted, for the criminal offense of Theft Of Property I, (First (1st) Degree), as defined, pursuant to the Criminal **Code Of Alabama**, 1975, as amended, Title 13A-8-3, and subsequently imposed a sentence of a total term of Twenty (20) years to be served in the control, custody and security of the Alabama Department Of Corrections, by the Circuit Court Of Shelby County, Alabama, Eighteenth (18th) Judicial Circuit, the Honorable Michael Joiner, Circuit Court Judge.

As of the date of filing this complaint, the Plaintiff's record of conduct for a substantial specified period of time, specifically, an approximate period of seven (7) years shows that he has faithfully observed, the rule(s) of the institution, however, solely based on the length of his sentence exceeding Fifteen (15) years without a legitimate penological interest whatsoever, he is categorically being denied and prohibited, from earning any of the incentive time deduction credits, pursuant to the Alabama Correctional Incentive Time Deductions Act, as codified by the **Code Of Alabama**, 1975, as amended, Title §14-9-41, from his twenty (20) year sentence, as imposed, by the Circuit Court Of Shelby County, Alabama, Eighteenth (18th) Judicial Circuit, the Honorable Michael Joiner, Circuit Court Judge.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT
NORTHERN DIVISION

Cedric Allen Smith
PLAINTIFF(S)

\*  CIVIL NUMBER 2:07-CV-98-MEF

\*

VS.                                    \*

RICHARD ALLEN et.al.                   \*
DEFENDANT(S)

\*

\*

OBJECTION TO THE MAGISTRATE RECOMMENDATION TO DISMISS

Comes now the plaintiff(s) Cedric Allen Smith , pro se, do asserts
the following objection to the magistrate recommendation of dismiss-
ing plaintiff(s) complaint.  Plaintiff(s) do asserts the following:

JURISDICTION

28 U.S.C.A. 1331,1343,(a) (4).  The District Court shall have Orig-
inal jurisdiction of all civil actions arising under the constitut-
ion, laws, or treaties of the United states.
A state court's inability to grant relief does not bar a federal
court's assuming jurisdiction to inquire into alleged deprivation of
federal constitutional rights: " 369 U.S. at 236, 82 S. ct. at 720.
The Fourteenth amendment means "that no person or class of persons
shall be denied the same protection of the laws which is enjoyed by
other persons or other classes in the same place and under like cir-
cumstances.  The general doctrine is that the amendment, in respect
of the administration of criminal justice, requires that no different
degree or higher punishment shall be imposed on one than is imposed
on all like offenses.  Moore v. Missouri, 159 U.S. 673, 40 L. ed 301
(1895).
"Judicial inquiry under equal protection clause, therefore, does not

(1)

end with a showing of equal application among the members of the
class defined by the legislation.  The courts must reach and deter-
mine the question whether the classification drawn in a statute are
reasonable in light of its purpose.  McLaughin v. Florida, 379 U.S.
at 191 85 S. ct. 288.

Every person who under the color of any statute, ordinance, regul-
ation, custom or usage of any state or territory, subjects, or causes
to be subjected, any citizen if the United States or other person
within the jurisdiction thereof to the deprivation of any rights, pr-
ivileges, or immunities secured by the constitution and laws, shall
be liable to party injured in an action at law suit in equity, or
other proceeding for redress.  The District Court shall have original
jurisdiction of any civil action authorized by law to be commenced
by any person: Monroe v. Pape, 5 L ed 2d 492.

The prisoner(s) pleading states causes of action under federal civil
rights statutes for deprivation of constitutional rights by prison
officials.

Equal protection prohibits states and their political subdivision
from treating similarly situated citizens differently. Romer v. Evans,
517 U.S. 620, the degree of protection varies according to the class
of persons discriminated against or the interest that the classifi-
cation compromise, City of Clebrune v. Cleburne Living Ctr., 473 U.S.
432.

The Magistrate do not argue that the plaintiff(s) fails to state a
valid equal protection claim, therefore, plaintiffs equal protection
claim remains.  Osborne v. Folmar, 735 F. 2d 1316 (11th cir. 1984).
The plaintiff(s) Artie Allen Smith , is similarly situated with
other prisoners, who were given earlier tenative release dates, and
(2)    Defendants  have engaged in invidious discrimination against
plaintiff(s) based upon their membership in a constitutionally pro-
tected class.

The plaintiff(s) equal protection claim is to be a challenge to the
denial of incentive goodtime entitlement and its process... The pla-
intiff(s) also request a change in the department of corrections
procedures which doesn't comply with legislative intent in passing
80-446 (C. I. T.) so that he may be properly considered fairly for
incentive goodtime.

The question before this court concerns not the loss of goodtime,
not not the restoration of good time credits, but, the constitutio-
nality of acts 80-446 through the vehicle of the "MaDonald Amendment"
of the alabama law, which denies state prisoners goodtime, and im-
proper classification in the way it has been administered by prison
officials, without a penological reason.  Plaintiff(s) states that,
disallowing such credit to them while permitting credit up to the full
period for other inmates who are similary situated denied to him equal
protection of the law. McGinnis v. Royster, 35 L ed 2d 282 (1973).
The plaintiff(s) asserts that, dismissal of a complaint is appropiate
"only" if it is clear that no relief could be granted under any set
of facts that could be proved consistent with the allegations, Black-
ston v. Alabama, 30 F 3d 117 (11th cir. 1994) on a motion to dismiss
the court must accept as true all facts alleged and draw all infer-
ences therefrom in the light most favorable to the plaintiff.   Hun-
nings  v. Texaco, Inc. 29 F. 3d 1480 (11th cir 1994) a very low suf-
ficiency threshold is necessary for a complaint to survive a motion to
dismiss. Ancata v. Prison Health Serv., Inc., 769 F. 2d 700,703
(11th cir. 1985) , moreover, a complaint should not be dismissed for
failure to state a claim upon which relief can be granted "unless" it
appears beyond doubt that the plaintiffs can prove no set of facts
in support of his claim which would entitle him to relief.
Substantive due process applies when a plaintiff challenges the val-
idity of a legislative act.  Typically, a legislative act will with-
stand substantive due process challenge if the goverment "Identifies"
a legitimate state interest that the legislature could rationally
conclude was served by statute. Alexander v. Whitman, 227 F 3d 133
(3rd cir. 2000).  Frazier v. Manson, 703 F. 2d 30 (1983), in applying
the rational basis test to determine whether the discriminatory class-
ification under attack serves some legitimate purpose.
Claims attacking the parole decision process have not been construed
as attacks on a prisoner's confinement and have therefore been per-
mitted to proceed under section 1983. Citing from Parisie v. Mums,
873 F. Supp. 1560, Williams v. McCall, 531 F. 2d 1247 (5th cir. 1976)
similarly, in Gwinn, supra, the eleventh circuit construed a section
1983 plaintiff(s) equal protection claims to be challenged to the
parole decision process, and thus refused to dismiss it for failure
to exhaust state remedies.  This claim for prospective injunctive
relief could properly be brought under section 1983 "because a decla-

ration of unconstitutionality of a state administrative action. The plaintiff(s) vehemently objects to the magistrate recommendation to dismiss complaint because it is misplaced and without substance. The magistrate cites "Preiser and its progency for authority in dismissing plaintiff(s) complaint when in fact, Preiser' is attacking the validity or duration of their confinement based on loss of good-time credits pursuant to a disciplinary infraction. The plaintiff(s) are attacking a constitutional challenge to the conditions of their prison life based on the procedure(s) use to deny goodtime credits. Plaintiff(s) are made to work without any deductions from their sentences when it is clear from the law (80-446), that prisoners were to receive some deduction off their sentences based on their behavior and work ethics. It is clear that, in 'Preiser', supra, these inmates were deprived of their credit deductions as a result of disciplinary proceedings, and they sought injunctive relief to compel restoration of the credits which would ultimately release them from confinement... This case simply has no standing in plaintiff(s) complaint. The plaintiff(s) were constitutionally given goodtime reduction by law (see acts 80-446), but are being categorically denied this right... without disciplinary proceeding.

## CONTINUED OBJECTION TO MAGISTRATE RECOMMENDATION

The magistrate recommendation alleges (in his footnote) that the pla-
intiff(s) amended complaint alleges that the commissioner amended 80-446
from 10 years to 15 years in 1991.  The plaintiff(s) does not refute
this, the plaintiff(s) stated this because, it is very hard to believe
that the legislature passed this act knowing that they had recently
passed this same act with amendments denying inmates with 10 years or
more, class "A" felony(s) and those who received a sentence in the class
"A" felony range, and stated reasons why.  The plaintiff(s) asserts
that, it doesn't matter who "purportedly" passed the 1991 amendment or
how it was "allegedly" passed... it went against legislative intent
and allowed serious offenders to receive goodtime credits thereby deny-
ing other prisoners the equal protection of law to be treated the same
way.  The magistrate theory that this act passed in the legislature, is
only " a barebone" assumption; the prerequisite of its passage can
only be proved by the legislative journals, and not by its "enactment
or codification.

The plaintiff(s) further objects to the magistrates recommendation
of dismissing this complaint, because it is clear that the magistrate
is basing his recommendation (by inserting it in a footnote) on prior
law and rulings which cannot be submitted to refute the merits of this
complaint.  The magistrate cited, and mis-quoted Thornton v.Hunt, 852
F. 2d 526, 527 (11th cir. 1988), and has purposely changed the 10 years
in this ruling to 15 years in an attempt to try and change the legis-
lature prior decision that stated...10 years or more are serious offen-
ders and should not be entitled to goodtime.

The plaintiff(s) further objects to the magistrates recommendation
of dimissing this complaint, because, he furthers bases his recomm-
endation on prior rulings found in Conlogue v. Shinbaum, 949 F. 2d
378, 382 (11th Cir. 1991).  The plaintiff(s) asserts that, this ruling
should have never been apart of the magistrate decision (not even in
his footnotes) because, at the time this case was decided, prisoners
goodtime was governed by an administrative regulation that was in the
discretion of the department of correction.  The court ruled in that
case, that, the administration regulation was not law and the inmate
did not show a claim... however, the plaintiff(s) states that "80-446"
is "purported" to law... and law is not discretionary.

Plaintiff(s) further asserts that, if this law (80-446) was discret-ionary, we would still retain a claim under the way its being applied under abuse of discretion, and equal protection under the U.S.C.A. 14.

In the furthering of the plaintiff(s) objection to the magistrate recommendation to dimiss the complaint, the plaintiff(s) will like to point out a ruling that the magistrate dilberately stay away from, and the very dishonest attempt to protect those who "allegedly" passed this law that is literally violating prisoners constitutional rights, and at the same time, endangering every child and person that cannot pro-tect themselves from a dangerous assault by giving these prisoners in-centive goodtime.  In **Brooks v. State,** 622 so 2d 447, Judge Bowen, stated "The minimum sentence for a class "A" felony is 10 years, Ala-bama Code 1975, § 13A-5-6, class "A" felonies...are...ineligible for goodtime because the legislature obviously deemed the nature of their offenses too <u>serious</u> to merit the benefits of goodtime sentence re-duction.  It is reasonable to assume that legislature deemed that class "A" felonies, and those with 10 years or over were too <u>serious</u> to merit the benefits of goodtime reduction... then why, in "Brooks" supra, did the legislature, in 1991, raised the eligibilty for good time reduction from 10 years to 15 years?  The legislature made it be known prior to "Brooks", that, class "A" felonies, and sentences that are 10 or more years should not get beneficial treatment because their crimes are deemed to be too serious, so why the raise?  Didn't the legislature knew that the raise would only help child sexual predators, and prisoners with violent assault cases, also, didn't the legislature knew that such a raise would go directly against their original intent concerning the **seriousness of offense and length of sentence?** didn't the legislature know that this standard would no longer be applicable to any inmate anymore? Consequently, subsection (e) of § 14-9-41 should have "went out the window when "Brooks" pr-oved that subsection (h) in the same statute was deemed unconstitutional in its application.  The plaintiff(s), in furtherance of their ob-jection to the magistrate order, would like to point out that the magistrate seems to assert that, prisoners are governed by the st-atutory codification of § 14-9-41 (e), when in fact the plaintiffs are serving time under the legislature enactment of 80-446 which in its entitlement, clearly used mandatory and not discretionary lan-guage for the implementation of goodtime reductions.

The plaintiff(s) asserts that, § 14-9-41 (e) is not law, but rather, a senate bill that did not go through the proper procedures to become law, this is a common pratice in that part of the government see: **Ex parte Coker,** 575 so 2d 43. See also: **The legislative - equivalency doctrine.** So the plaintiff(s) asserts that, to dimiss this complaint, would allow statutory codification to control over cleary legislative enacted law (80-446).

The plaintiff(s) objects to the magistrate recommendation of dismissing the complaint because his recommendation is baseless. The magistrate is of the opinion of the "so called" rationale (theory) behind the justification of an individual being sentenced to a longer sentence determines that the individual(s) is a more serious offender and should be denied early release which entails being denied the incentive good time process. That rationale would disgust itself as being legitimacy of not violating the equal protection clause, or the due process clause. This rationale would in itself at the orgin of its creation through legislature, would render the law enacted unconstitutional violation of the 14th amendment. **McLaughlin v. Florida,** 379 U S at 191 85 S. ct. at 288. **Moore v. Missouri,** 159 U S 673 at 678, **Brooks v. State,** 622 so 2d 447 ( Ala. Cr. App. 1993). **Falkner v. State,** 586 so 2d 39 46 (Ala. Cr. App. 1991). Finally, with due respect to the magistrate, what purpose would law makers, judges, and other governmental function serve if this rationale that you recommended from old law which was uncovered and defeated, would serve if the acting authors that presided in such seats of power only usedthis "so called" rationale to justify triumping upon the constition of the United States which this country is governed by for its citizens whether incarcerated or not, this golden rule the constitution is guaranteed. Merits of claim(s) and jurisdiction are obvious to the rules of law.

DONE THIS THE ___9th___ DAY OF ___Ahil___ 2007.

_Odric Allen Smith_
**PLAINTIFF(S)**

## ARGUMENT IN SUPPORT OF PETITION

The Petitioner _Cedric Allen Smith_____, and others similary situa-
ted asserts that the laws that prohibits (subsection (e) "McDonald
Amendment") from earning incentive goodtime credits, and from being
properly classified are not valid, or do not constitutionally exsist
as they do not conform to certain constitutional prerequisites, and
thus are not law at all (80-446) codified in the code of alabama.

The Petitioner(s) have been informed that these laws or statutes used
in regulation 427 are located in and derived from a collection of bo-
oks entitled "code of alabama 1975". Upon looking up and studying
these laws in the publication, and the amendments to this law, we have
realized that they do not adhere to several provisions of the alabama
constitution of 1901.
By article IV (4) section 45 of the constitution of alabama (1901),
all law making authority for the state is vested in the legislature
of alabama. This article also prescribes certain forms, modes and
procedures that must be followed in order for a valid law to exsist
under the constitution. It is fundamental that nothing can be a law
that is not enacted by the legislature prescribed by the constitution
and which fails to conform to constitution forms, prerequisites or
prohibitions. These are grounds for challenging a valid law or stat-
ute. The following explains in authorative details why the laws that
governs the petitioner(s) are not constitutionally valid laws.

Is the agency regulation legislative or interpretive? A regulation
promulgated in the following circumstances is legislative; If con-
gress has explicity left a gap for the agency to fill, there is an
expressed delegation of authority to the agency to elucidate a spec-
ific provision of the statute by regulation "Chevron, 467 U.S. at
843-44, 104 S. ct 2778 legislative regulations are to be given "con-
trolling weight unless they are arbitrary, capricious, or manifestly
contrary to the statute.

The revision of the alabama sentencing law came into effect in late
1977. This act created a greater sentence enhancment than the prior
sentencing act. In 1980, acts 80-446 was created by the alabama

legislature.  This act awarded each prisoner more goodtime than the
prior act.  Incentive goodtime was implemented by the legislature of
alabama to encourage good prison behavior and prison rehabilitation.
But this act has not been followed by the Department Of Corrections,
and has been changed and altered at the commissioners will.

Interpretative regulations, on the other hand, clarify ambigous terms
found in the statute or explain how provision operates.  Interpretive
regulations are accorded "considerable weight". Id, and should be up-
held if they implement the congressional mandate in reasonable manner.
National muffler dealers Ass'n. Inc. V. United States, 440 U.S. 472
476 99 S. ct. 1304 59 L. ed 2d 519 (1979).....
Whether the "Bill" was properly enacted into law, then whether the
statutory codification of a bill that is not deposited within 10 day
period gives it force and effect of law: See: Exparte Coker, 575 so
2d 43.


BY CONSTITUTIONAL MANDATE, ALL LAWS MUST HAVE AN ENACTING CLAUSE:


One of the forms that all laws are required to follow by the cons-
titution of alabama, (1901), is that they contain an enacting styled
or clause.  This provision is stated as follows:

> "Article IV section 45.  The style
> of the laws of this state shall be,
> "Be it enacted by the legislature of
> Alabama"

None of the laws cited in 80-446 that governs the petitioner(s) as
found in the "code of alabama 1975" contain any enacting clauses.
The constitutional provision which prescribes an enacting clause for
all laws is not directory, but mandatory.  This provision is to be
strictly adhered to as asserted by the federal circuit court of ala-
bama:

> "petitioner correctly urges that this section
> is mandatory, and not directory; that no
> equivalent words will suffice; and that any
> departure from the mode prescribed is fatal
> to the enactment since if one departure in
> style, however slight, is, is permitted,
> another must be, and the constitutional
> policy embodied in the section would become
> without any force whatever". see: Montgomery
> Amusement co. v. Montgomery Traction Co.,
> 139 Fed. 353, 338 (1905).

10

The denial of petitioner(s) incentive goodtime and to be properly classified are without this mandatory constitutional provision.

**1.Constitutional Law. Key 70.1 (1)**
Legislature's power is plenary unless controlled or limited by other provisions of constitution and courts cannot look to wisdom or folly advantages or disadvantages of rules which legislative body adopts to govern its own proceeding. Const. 1901;

## Statutes Key 130

Joint resolution of legislature cannot be used to amend existing statute. (Const. 1901).
(3). For amendment to existing statute to be valid, it had to be passed in accordance with same constitutional requirements as were necessary to enact original statute and could not be effected by joint resolution. (Const. 1901).

## What are these Constitutional Rules?

No law shall be passed except by bill, and no bill amended so as to change its original purpose. Section 61. No bill shall become a law until it shall have been referred to and acted upon by standing comm-ittee. Section 62. Every bill shall be read on three different days in each house. The final reading to be at length, and passed by a majority vote of yeas and nays entered on the journals.

Moreover, we note that section 45 provides, among other things, that... no law shall be revived, amendmeded, or the provision there of extended or conferred, by a reference to its title only; But so much thereof as is revived, amended, extended, or conferred, shall be re-enacted and published at length.
Thus, statutes which are amended must be re-enacted and published at length. Clearly, the phrase "published at length" was intended to re-quire notice to the citizens of the state.

1. Does section 1 of senate bill 107 "Cook Substitute" which contains the "McDonald Amendment" as substituted and amended contain more than one subject and as a result conflict with article IV, section 45 of the constitution of alabama of 1901?

2. Does senate bill 107, as substituted and amended by the "McDonald Amendment" change the original purpose of the original S.B. 107 and as a result conflicted with article IV, section 61 of the constitution of alabama 1901?

## WHAT IS THE PURPOSE OF THE CONSTITUTIONAL PROVISION
## FOR AN ENACTING CLAUSE:

To determine the validity of using laws without an exacting clause against citizens, we need to determine the purpose and function of an enacting clause: and also to see what problems or evils were intended to be avdoided by including such a provision in our state constitution.  One object of the constitution mandate for an enacting clause is to show that the law is one enacted by the legislature body which has been given the law making authority under the constitution.

The purpose of thus prescribing an enacting clause-"The style of the acts-is to establish it.  To give it permanence, uniformity, and certainty; to identify the act of legislations as of the general assembly; to afford evidence of its legislative statutory nature; and to secure uniformity of identification and thus prevent inadvertance, possibly mistakes and fraud.  State V. Patterson, 4 S.E. 350,352,98 NC 660 (1887). 82 C.J.S. "Statutes, "see 65P. 104. Joiner V. State, 155 S.E. 2d,B,19,223 GA. 367 (1967).

What is the object of the style of a bill or enacting clause anyway? TO SHOW THE AUTHORITY BY WHICH THE BILL IS ENACTED INTO LAW; to show that acts come from a place pointed out by the constitution as the source of legislation.  Ferill V. Keel, 151 S.W. 269,272, 105 ARK. 380 (1912).

To fulfill the purpose of identfying the lawmaking aurthority of a law, it has been repeatedly declared by the courts of this land that an enacting clause is to appear on the face of every law which the people are expected to follow and obey.

The almost unbroken custom of centries has been to preface laws with a statement in some from declaring the enacting authority.  The purpose of an enacting clause of a statute is to identify it as an act of legislation by expressing on its face the authority behind the act. 73 AM. JUR. 2d; "statutes", sec. 93, P. 319,320, Preckel V. Byrne, 243, N.W. 923, 826, 62 N.D. 356 (1932).

12

The failure of a law to display on its face an enacting clause de-
priving it of essential legality, and renders a statute which omits
such clause as "a nullity and of no force of law "Joiner V. State,
supra.  The statute prohibiting the petitioner(s) from incentive
goodtime  credits have no jurisdictional identity and are not auth-
entic laws under the constitution of alabama.

Section 106, constitution of alabama, 1901, requires publication of
a local act prior to its consideration by the legislature.  This is
an order to give affected persons notice of the substance of the pro-
posed law, of its characteristic, and essential provision, and its
most important features, Wilkins V. Woolf,281, Ala. 693, 208 so 2d
74 (1968).

The petitioner(s) insist that the exercise of the severance clause
defeats the legislative intention of the act and the "McDonald Amen-
dment" had been written into the act, which afforded 'sex offendeers'
and serious violent offenders incentive goodtime it probably would
not have passed.

The court has Judicial knowledge of the legislative records of the
state, including the legislative journals and records if bills as
introduced and acts passed.


The alleged act or law in question is unamed: it shows no sign of
authority: it carries with it no evidence that the general assembly
or any other lawmaking power is responsible or answerable for it.
By an enacting clause, the makers of the constitution intended that
the general assembly should make its impress or seal, as it were,
upon upon each enactment for the sake of identity, and to assume
and show responsibility.  While the constitution makes this a nec-
essity, it did not originate it.  The custom is in use practically
everywhere, and is as old as parliamentary government, as king's
decrees, and even they borrowed it, the decrees of cyrus, king of
persia, which holy writ records, were not the first to be prefaced
with a statement of authority.  The law was delivered to Moses in
the name of the Great I AM, and the prologue to the great command-
ments is no less majestic and Impelling.  But, whether these edicts
and commands be promulgated by the supreme ruler or by petty kings
or by the sovereign people themselves, they have always begun with
some such form ASA Evidence Of Power And Authority.  Commonwealth
V. Illinois Cent. R. Co. 170 S.W. 171,172,175 160 Ky. 745 (1914).

The "laws" used against the petitioner(s) are unamed.

13

They show no sign of authority on their face as recorded in the "code of alabama 1975"; they carry with them no evidence that the legislature of alabama, pursuant to article IV of the constitution of alabama (1901), is responsible for these laws.  Without an enacting clause, the laws referenced to in the complaints have no official evidence that they are from an authority which we are subject to or required to obey.

When the question of the objects intended to be secured by the enacting clause provision "was before the supreme court of alabama, the court held that such a clause was necessary to show the people who are to obey the law, the authority for the obedience.  It was revealed that historically this was a main use for an enacting clause, and thus its use is a fundamental concept of law.  The court stated:  All written laws, in all times  and in all countries, whether in the form of decrees issued by absolute monarch, or statutes enacted by king and counsel, or by a representive body, have as a rule, <u>expressed upon their face the authority by which they were promulgated or enacted</u>. The almost unbroken custom of centries has been to preface laws with a statement in some form declaring the <u>enacting authority,</u> <u>if</u> such an enacting clause is a mere matter of form, a relic of antiquity, serving no useful purpose, why should the constitutions of so many of our states require <u>that all laws</u> must have an enacting clause, and prescribes its form.  If an enacting clause is useful and important,If it is desirable that laws <u>shall bear upon their face the authority by which they are enacted, so the people who are to obey them need not to search legislative and other records to ascertain the authority,</u> then it is not benearh the dignity of the framers of a constitution, or unworty of such an instrument, to prescribe a uniform style for such enacting clause.


The words of the constitution, that the style of laws of this state be "**BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF ALABAMA**", imply that <u>all laws</u> <u>must</u> <u>be</u> so <u>expressed or declared, to the end that they may be expressed upon their face the authority by which they were enacted;</u> and, if they do not so declare, they are not <u>laws</u> of this state. <u>Sjoberg v. security saving & loan assn.73 Minn 203 (1898)</u>.


This case by the petitioner(s) when they discovered that the incentive goodtime statute provided goodtime to serious offenders and sex

offenders, but denied goodtime to property offenders and non violent
offenders; the petitioners also discovered that this act has been
amended constantly against the constitution (1901).  This statute
has no enacting clause, nor does it has permanence within its print-
ing in the statute book "code of alabama 1975".

The purported law in this complaint in which governs the petitioner(s)
are referenced to various laws found printed in the "code of alabama
1975 book".  We have looked up the laws that governs us in this book
and found no enacting clause for any of these laws.  A citizen is not
expected or required to search through other records or books for
the enacting authority.  If such enacting authority is not "on the
face" of the laws which referenced in a complaint, then they are not
laws of this state.

The provision requiring an enacting clause and one-subject titles
were adhered to with the publications known as the"session laws" for
the state of alabama.  But because certain people in government thou-
ght that they could devise a more convenient way of doing things with-
out regard for provisions of the state constitution, they devised the
contrivance known as the"code of alabama 1975", and then held it out
to the people as being "law".  This of course was fraud, subversion,
and a great deception upon the people of this state which is now re-
vealed and exposed. The petitioner, Cedric Allen Smith, and others
similar situtated, is automatically classified as a prisoner who re-
fuse  to work, commits disciplinary infractions and who do not abide
by institutional rules  based soley on his length of sentence which
denies him due process of law.  See: Neal V. Shimoda, 131 F. 3d 818
(9th Cir. 1997). Labelling as "sex offender" prisoner who had never
been convicted of sex offense or given opportunity to challenge label
in adversary proceeding violated due process was entitled to injunt-
ive relief.

Statutes key 145
Bill which was pocket vetoed, did not become law through its incor-
poration in cumulative  supplement to code since bill never became
law, it could not be subject of statutory codification; Const. Art. 5
125.

15

Act 80-446 as amended to add the "McDonald Amendment" was not ad-
vertised 106, as amended.

1. Does act 80-446 as engrossed violate section 61 of the constitution
of 1901 which provides in part: 'no bill shall be so altered or amen-
ded on its passage through either house as to change its original
purpose?

2. Does house act 80-446 as engrossed violate section 45 of the con-
stitution of 1901 which provides in part that 'each law shall contain
but one subject, which clearly should be expressed in its title.

## QUESTION OF ISSUES

1. Is the agency regulation legislative or interpretive?
A regulation promulgated in the following circumstances is legisl-
ative ; if congress has explicity left a gap for the agency to fill
there is an expressed delegation of authority to the agency to eluci-
date a specific provision of the statute by regulation:Chevron,467
U.S.at 843-44, 104 S. ct 2778.  Legislative regulations are to be
given "controlling weigh unless they are arbitrary, capricious, or
manifestly contrary to the statute.

2. Act 80-446 as it is being administered provided goodtime credits
for violent sexual habitual and serious offenders for prisoners who
has been sentenced to 15 years or less, but denies goodtime goodtime
to all prisoners who are sentenced to more than 15 years.

3. Commissioner's amendment subsection (e) is in conflict with the
statute and its own regulations?

4. The revision of the alabama sentencing law came into effect in
1980 act 80-446, this act created a greater sentence enhancement than
the old sentencing act, therefore, the legislature awarded each pri-
soner more goodtime than the original act.  But this act had not been
followed by the department of correction.

Incentive goodtime was implemented by the legislature of alabama to encourage good prison behavior and prison rehabilitation.

6. The 1980 subsection (e) amendment (McDonald Amendment) and the 1991 (15) years amendment to subsection (e) was not merely procedure.

7. By placing an inmate in a particular class indefinately directs concerned ongoing and future not past conduct.

8. The Department of Correction's continuing practice of not allowing inmates to earn goodtime while in a earning class and by placing them in a non earning class (4) (based soley on the length of sentence) indefinately, is sufficient ti create a protectable liberty interest and denies to them equal protection of the law 80-446.

9. Has the Department of Corrections adopted a permissible construction of the statute?

10. Whether the bill was properly enacted into law, then whether the statutory codification of a bill that is not deposited within a 10-day period gives it the force and effect of law. See: Ex parte Coker, 575 so 2d 43.

## LEGISLATIVE STATUTE

The Courts of alabama will take judicial notice of the journals of both houses of the legislature.  If there is a material variance between the enrolled bill signed by the governor and the bill actually passed,  By the legislature as shown by the journals of the two houses , such variance is fatal to the vality of the enactment as a law. Moog v. Randolph, 77 Ala. 597 (1884). Mayor and Alderman of west end v. Simmons, 165 Ala. 359, 51 so 2d 638 (1910).

The violation of section 61 occurs when the "purpose" of the bill passed is different from the original "purpose" of the bill introduced. "The purpose" of a bill within this section is the general purpose of a bill, not mere details through which it purpose is manifested and effectuated. Opinion of the justice, 361 so. 2d 536.

17

## LEGISLATURE ENACTMENTS OF LAW

Section 106, constitution of alabama 1901, requires publication of a local act prior to its consideration by the legislature. This is in order to give affected persons notice of the substance of the purposed law, of its characteristic and essential provisions, and its most important features: <u>Wilkins V. woolf,</u> 281 Ala. 693, 208 so 2d 74 (1968). <u>Wilkinson V. Allen,</u> 219 Ala. 590, 123 so. 36 (1920). See: <u>Adam  V. Shelby County Comm.</u>, 415 so 2d 1066.

<u>Hamilton v. Autauga County,</u> (1971) 289 Ala. 419-Appellant however, insist that the exercise of the severance clause defeats the legislative intention of the legislature was to exempt certain counties from the general provision of the act, and that had yhese exceptions not been written into the act, it probably would not have passed.
The court has judicial knowledge of the legislative records of the state, including the legislative journals and the records of bills as introduced and acts passed.
The journal of the house of representatives indicates that the bill was properly passed. We have no authority to go beyond the legislative journals and look at extrinsic evidence attacking the regularity of the bills enactment: <u>Opinion of the justice,</u>412 so 2d 279 (Ala. 1982), In <u>Robertson V. State,</u> 130 Ala. 164.

Opinion of Justice, 892 so 2d 332, "Separation of Power", <u>Densmore V. Jefferson County,</u> 813 so 2d 844 (2001) LL LE Petroleum Mictg. V. Dept. of Revenue 683 so 2d 980 (1996) "Codification of a code" <u>Jones v. Conrad,</u> 673 so 2d 389 (1995), <u>Roe v. Mobile County Appointment Bd.,</u> 676 so 2d 1206 (1995). Statutes are to be construed in amanner "that is consistent with related statutory provisions" <u>John Deere Co. V. Gamble,</u> 523 so 2d 95, Legislative intent is discernible from construction of a statute in relation to "the whole law" or to other laws. <u>Henderson by and through Hartsfield V. Alabama Power Co.,</u> 627 so 2d 878. When an act was being debated in the house and the senate, legislature heard all arguments for and against the placing of caps, and another legislature composed of different representives and senators, might reach a different conclusion than did the legislature that passed this act.
"The cardinal rule for construction of a statute is to ascertain the legislative intent, which must be determined by examining the statute

18

as a whole in light of its general purpose. Gulf Coast Media V. Mobile Press Register Inc., 470 so 2d 1211 (1985) " One approach in determining the legislative purpose and intent is to examine the prior law , and related statutes, on the subject embraced in the statute being construed. "State V. AAA Motor Lines, Inc., 275 Ala. 405 155 so 2d 509 (1963).

In 1975, the alabama legislature passed act 214 (SGT) both (IGT) was consolidated.

In 1980, (CIT) was passed.

"Incentive" means "something that constitutes a motive or "spur" and serving to encourage, rouse, or move to action.

"Good conduct statutes are framed with the intention of improving prison discipline, and have that effect if their enforcement is allowed the credits are said to be in the nature of payment or reward by the state to the conduct for his good behavior, in order to stimulate him to coform to the rules of the institution and to avoid the commission of crimes and misdeneanors during his imprisonment, such statute are prompted by the highest motive of humanity, and are looekd on with favor both by federal and state legislatures". 21 R.C.L. 1192 L 26 (Clays Digest P. 406 J67) statute was enacted "for encouragement of the convicts to conduct themselves with and propierty. In construing these statutes this purpose should, of course, have appropiate consideration. The court held in Baker V. Baxley (1977)..."so where the language of the statute is reasonably plain in its meaning, such interpretation and pratice will not be accorded the effect of an amendment or repeal, and the legislative intent will be nevertheless declared and enforced as expressed...".

## CASE LAW IN AUTHORITY

Program statements are entitled to considerably less deference than published regulations because programs statements are "merely internal agency guidelines (that) may be altered by the bereau at will". See also Roussos, 122 F.3d 163. Noting that program statements receive only "some deference" rather than the greater deference accord regulations under chevron. By contrast, the regulation at issue here under went extensive public notice and comment before it was adopted and can only be altered by the board after an equally ekaborate process. See: Jackson v. Crabtree, 114 F. 3d 983. Moreover, our decision in

**19**

"Roussos", rested in part on the fact that the contested program statement conflicted not only with section 3621 (e) (2) (b), but with the bureau's own regulation as well.  Roussos, 122 F. 3d 163 "The Bureau converted a non violent crime into a violent one by means of a program statement that inconsistent with the language of the statute, and its own regulations".  The purpose of the prohibition against ex post facto laws is to assure that legislative acts "give fair warning of their effect and permit individuals to rely on their meaning until explicity changed, Weaver 450 U.S at 28-29, 101 S.ct 963.

Southern UTE Indian Tribe  V. AMOCO Production CO. 119 F 3d 816 (1977 10th cir). B. The format of decision making: To satisfy chevron, the delegation of authority to form binding policy must include not only discretion to utilize the particular format selected. See: Robert A. Anthony, which agency interpretations should bind citizens and the courts? 7 yale J. on Reg. 1,4 (1990) The touchstone in every case is whether congress intended to delegate to the agency the power to interpret with the force of laws in the particular format that was used").  After analyzing supreme court cases, commentators Davis and Pierce have concluded "chevron should be held to apply to the meaning agencies give statutes in all legislative rules and in most adjudications.  But it should not be held to apply to agency pronouncements in less formal formats.

Exparte  V. Coker,575 so 2d 43, 1901 Constitutional Convention relating to the power of the governor to pocket veto legislation, and failure to deposit it with the secretary of state within 10 days of the final adjournment of the legislature, as specified in the constitution.  The majority, in attempting to justify its refusal to apply the priciple of the law that constitutional infirmities in previous legislation can be cured by incorporating the provisions of the legislation into a code , states that "whatever the scope of that principles... it does not reach so far as to alter the approval or dispproval or disapproval power of the executive branch of our government", and that "to extend this principle to the  instant case would allow statutory codification to control over a pocket veto, thus overriding the pocket veto powers of the governor!!! See: Miller v. state  426 so 2d 949.

## CASE LAW IN AUTHORITY

Ward V. Booker, 202 F 3d 1249 (10th cir. 2000)(BOP) prisoners was
allowed to receive a deduction from their sentences for non violent
crimes and participating in a drug program.  In 1995, the BOP prom-
ulgated a regulation which excluded from eligibilty inmates whose
"current offense" is a crime of violence.  Inmates around the country
began to challenge the program statement.  Inmates as Fristo 144 F 3d
690-30, who articulated this argument to this court as "whether the
BOP has adopted a permissible construction of the statute (18 U.S.C.
§3621 (e)(2)(b) ): We concluded it had not: The BOP interpretation
violates the plain language of the statute and cannot be upheld.  We
noted that most other courts had reached the same conclusion.  We
simply hold that the BOP may not disregard the statutory eligibilty re-
quirement by catergorically excluding from sentence reduction eligi-
bilty prisoners convicted of non violent offenses whose sentence were
enhanced because of firearms.  In doing so, it has exceeded its sta-
tutory authority.

Martin v. Gerlinski, 133 F 3d 1076-stated policy of Bureau of prisons
to consider sentencing factors in determing whether defendant was
convicted of a crime of violence that would preclude eligibilty for
early release based on completion of drug treatment program was con-
trary to statute authorizing such early release, since statute refer-
red to prisoners "convicted of non violent" offense and did not addressed
sentencing or sentence enhancement factors.

Venegas v. Henman, 126 F 3d 760 (5th cir 1997), the purpose of the
statute is to reduce recidivism, which in turn eases prison overcro-
wding and ultimately prevent crime.

Pelissero v. Thompson,170 F 3d 442 (4th cir 1999), The principles
governoring this analysis are well established: First, we must deter-
mine whether the statute directly addresses the precise issue before
us. "If the intent of congress is clear, that is the end of the matter;
for the court as well as the agency, must give effect to the unambig-
uously expressed intent of congress.  Chevron U.S.A. Inc. V. Natural
Resources Defense Counsel, Inc., 467 U.S. 837,842-43, 104 S. ct. 2778
81 L ed 2d 694 (1984).  Second, if the statute is silent or ambiguous
in expressing congressional intent, we must determine whether the agency

21

interpretation is based on a "permissible construction of the stat-
ute Chevron, 467 U.S. at 483 104 S. ct 2778, See: Ky. Dept. of Corr-
ection V. Thompson, 104 L ed 2d 506.


Landgraf V. USI Film Products, 128 L. ed 2d 229- Retroactive legisla-
tion presents problems of unfairness that are more serious than those
posed by prospective legislation, because it can deprive citizens of
legitimate expectations and upset settled transaction.  "The rule of law
is a defeasible entitlement of persons to have their behavior governed
by rules publicly fired in advance:

> "Every statute which takes away or impairs
> vested rights acquired under existing laws,
> or creates a new obligation, imposes a new
> disability, in respect to transaction or
> considerations already past, must be deemed
> retrospective".

Lynce V. Mathis, 137 L ed 2d 63-In arriving at our holding in Weaver
we relied not on the subjective motivation of the legislature in en-
acting the gain-time credits, but rather on whether objectively the
new statute "lengthened the period that someone in petitioner's pos-
ition must spend in prison.  Our determination that the new guideline
was more "onerous" than the prior law. Id, at 431, 96 L ed 2d 351, 107
S. ct. 2446. (Quoting Dobbert V. Florida , 432 U.S. 282,294,53 L.ed
2d 344, 97 S. ct 2290 (1977) rested entirely on an objective appraisal
of the impact of the change on the length of the offenders presumptive
sentence.  482 U.S. at 431, 96 L. ed 2d 351, 107 S. ct 2446 ("Looking
only at the change in primary offenses points, the revised guidelines
law clearly disadvantages petitioners and similarly situated defendants").
The 1992 law did not change the method of determining the sentence,
but rather lengthened the sentence of certain prisoners by making them
ineligible for early release, it was not merely procedural.  This re-
sult naturally follows from our consistent view that the clause is
intended to prohibit laws that retroactively alter the definition of
crimes or increases the punishment for criminal acts, Collins V. Young-
blood, 497 W 37,43 111 L ed 2d 30, 110 S.ct 2715 (1990).  Weaver V.
Graham ,67 L. ed 2d 17, 101 S. ct. 960, Johnson V. United States, 146
L ed 2d 727, Cal. Dept. of Corrections V. Morales, 131 L ed 2d 588
Tunick V. Safir, 209 F. 3d 67 (2nd cir. 2000).
Stephens V. Thomas, 19 F. 3d 498 (10th cir. 1994), New Mexico Dept. of
correction's revocation of goodtime credits from life term prisoners
who had served less than ten years of his sentence did not implicate
ex post facto clause; department revoked prisoner's erroneous parole

22

as immediate result of attorney general's directive that department
practice of affording prisoners with life sentences the benefits of
goodtime credits before their first ten years was beyond departments
authority and was erroneous interpretation of goodtime statute  and
correct interpretation of goodtime statute was foreseeable. U.S.C.A.
Const. Art. 1 § 10, CL 1. The New Mexico legislature has granted  the
department of correction no such power here. Knuck V. Wainwright, 759
F. 2d 856 (1985).

Edward V. Valdez , 789 F. 2d 1477 (10th cir 1986)
(C). Equal Protection: The United States Constitution generally pro-
vides that all persons similary situated should be treated alike.
Plyler V. Doe, 457 U.S. 202,216 102 S. ct 2382, 2394, 72 L ed 2d 786
(1982). :Strict scrutiny "and "rational basis", are the two traditional
standards used to determine the validity of legislation that is chall-
enged as denying equal protection . The strict scrutiny standard is
applied when a classification involves a suspect class or affects
a fundamental right. Orgin: City of Cleburne V. Cleburne Living Center,
105 S. ct 3249, 3255 , 87 L ed 2d 313 (1985), Fundamental rights in-
cludes voting, privacy, freedom of association, marriage, and travel.
See generally San Antonio school Dist. Rodriguez, 411 U.S. 1, 17-39
93 S. ct. 1278, 1288,-1300, 36 L ed 2d 16 (1973), If a statute defines
a class based on suspect category or if it infringes upon a fundamental
right, it is subject to strict scrutiny and will be substained only if
it is precisely tailored to further a compelling state interest.  If a
statute does not involve a suspect class, affect a fundamental right,
nor is it based on gender or legitmacy.  We conclude, therefore, that
the rational basis test should be applied to determine whether the
statute violates plaintiffs  right to equal protection.  The rational
basis test requires the court to identify the class created by the stat-
ute, and then determine whether the classification is rationally re-
lated to a legitimate interest.
The Federal court has been far from consistent in its articulation of
when it is appropriate to deviate from the plain language of a statute.
Hunt V. Nuclear Regulatory Commission, 611 F 2d 332. That legislative
history must always be examined regardless of the langauge of the
statute.
V.Tek V. Jones, Although the states interest in segregating and treating
mentally ill patients is strong, the prisoners interest is not being

23

arbitrarily classified as mentally ill and subjected to unwelcome
treatment is also powerful, and the risk of error in making the det-
erminations required by 83-180 (1) is substantial enough to warrant
appropriate safeguards against error.

Connecticut Board of Pardons V. Umschat, 69 L ed 2d 158, The state
board has created an unwritten common law of sentence commutation and
parole acceleration for connecticut life inmates...In effect, there
is an unspoken understanding between the state board (of pardons) and
and inmates; the terms are simple: If the inmate cooperates with the
state will exercise its parole powers on the inmates behalf; both the
state and the inmate recognize those terms. Each expects the other to
abide by them.

Mistretta V. United States, 488 U.S. at 371-379 102 L ed 2d 714 rule
making procedures: Thus, the guidelines are the equivalent of legis-
lative rules adopted by the federal agencies.  The function purpose
of commentary (of the kind at issue here) is to assist in the interpre-
tation and application of those rules, which are within the commission's
particular area  of concern and expetise and which the commission
itself has the responsibility to formulate and announce.  In these re-
spects this type of commentary is akin to an agency's interpretation
of its own legislative rules, as we have often stated, provided an
agencys interpretation of its own regulations does not violate the
constitution or a federal statute, it must be given "controlling weight"
unless it is plainly erroneous or incinsistent with the regulation:
Bowers V. Seminole Rock & Sand Co., 325  U.S. 410,414,89 L ed 1700
(1945).

Brooks V. State ,622 so 2d 447, Inmates equal protection challenge to
system that awarded goodtime credit to some, but not all prisoners
required court to inquire only whether challenged distinction ratio-
nally furthered some legitimate purpose.  Legislative decision to per-
mit retroactive grant goodtime credts to all but certain class of sex
offenders, with result that members of this class were treated different
from other kinds of sex offenders or from people who committed same
offense but were convicted and sentenced at later time, violated pri-
soners equal protection rights; difference in treatment appeared to be
based strictly upon timing of inmates conviction and sentencing rather
than upon any determination about nature or seriousness of offense.
Brooks was convicted in 1988 for the crime of sodomy second degree,
at that time, Brooks was not eligible to receive goodtime for the
following reasons:

24

(1). The alabama legislature prohibited anyone who had received a sentence of 10 years or more.

The alabama legislative interpretation of the statute in "Hilsabeck" v. State" 477 so 2d 471, stated that; the legislature denied incentive goodtime credits to class "A" felonies or anyone who receives a sentence in the class "A" felony range.  Because the legislature deemed that their crimes was to serious to meet beneficial treatment.  In 1991, the incentive goodtime was amended to allow inmates to receive goodtime credits whose sentences was more than 10 years but, 15 years or less. The petitioner(s) argues that this amendment went against legislative intent of the act, and proves that the "McDonald Amendment" serves no permanence purpose.

In Hilsabeck, the court stated that, "in analyzing equal protection challenges to the alabama correctional incentive time act:

> "we utilize the 'rational basis' test prescribed by by the United States Supreme Court.  Under this test, we must determine (1) whether the classification furthers a proper governmental purpose and (2) whether the class- ification is rationally related to that purpose".

The "McDonald Amendment" is no more than log rolling legislation. They can raise a permanent  portion of a statute (subsection (e) ) until it get the desired effect, no matter if it is published at length, no matter if violates those similar situated constitutional rights of equal protections, the legilature are going to raise the incentive goodtime until it is congruent with the intended purpose of **code of alabama, 14-9-41**, and thats (everyone receive some deductions from sentence other than life).  If the legislature denied inmates who were sentenced to 10 years or more the benefits to receive goodtime in accord with the "McDonald Amendment", Why then in 1991  the D.O.C. allowed inmates who was sentenced to more than 10 years but no more than 15 years to re- ceive goodtime.  It can be said that the next legislature can afford inmates who has been sentenced to a prison term other than for life to to receive goodtime as the original bill was purposed. Quoting: Exparte Metlof, 735 so 2d 1172...The problem, of course, as I have Illustrated above, is that while such a popular declaration may be all right today, we must ask: what about tomorrow's  judge and tomorrow's issue? If we are not restrained to the text of the constitution; If we current justice can amend it today by judicial declaration to in- clude a provision that the people have not put there, will the next "declaration" be so favorable?  As justice Cook has made clear in his

dissent, those with power can do some horrible reasons, it is naive
to think that something like that could not happen again.  My rule has
ever been to follow the fundamental law as it is written regardless
of consequences.  If the law does not work well, the people can amend it;
and inconveniences can be borne long enough to await that process.
But, if the legislature or the courts undertake to cure defects by forced
and unnatural constructions, they inflict a wound upon the constitution
which nothing can heal. One step taken by the legilature or the judiciary
in enlarging the powers of the government, opens the door for another,
which will be sure to follow; and so the process goes on, until all
respect for the fundamental law is lost, and the powers of the gover-
nment are just what those in authority please to call them".


## IN CONCLUSION


The equal protection clause does not deny the state the power to
treat different classes of people in diffenent way.  However, "the
classification must not be unrelated to the objective of the statute
and "must be reasonable, not arbitrary, and must rest upon some grou-
nd of difference having a fair and substantial relation to the object
of the legislation, so that all persons similarly circumstanced shall
to be treated alike".
What appears as §1 of the constitution of 1901 first appeared in the
constitution of 1875, as Art. 1 §1, it was followed by §2, which pro-
vided, in pertinent part:
"That all persons resident in this state...are hereby declared citizens
of the state of alabama, possessing equal civil and political rights".
"1. That all men are created equal; that they are endowed by their
creator with certain inalienable rights: that among these are life,
liberty, and the pirsuit of happiness.
"2. That all persons resident in this state, born in the United States,
or naturalized, or who shall have legally declared their intentions
to become citizens of the united states, are hereby declared citizens
of the state of alabama , possessing equal civil and political rights
and public privileges".
This was to protect Individuals right in this state, against hasty and
ill advised legislation. "sections 1, 6, 22, state constitution;
amendment 14, Federal Constitution; u.s.c.a....
"These taken together guarantee the equal protection of the laws,

26

**protect** persons as to their inalienable rights; prohibit one from being deprived of his inalienable rights without due process;and pro- hibit irrevocable or exclusive grants of special priviledges or imm- unities. "The court stated in "Exparte Metlof" 735 so 2d 1172 (1999), The provisions of §§1, 6, and 22 are just three examples of the many rights and protections contained in the-alabama constitution of 1901. We must apply those provisions, and the protections provided by stat- utes passed by the legislature, to all persons equally.

In <u>Brooks v.State, 622 so.2d 477 (Ala. Cr. App. 1993,</u> The legislature did not, however, narrow the class of prisoners qualified for sentence reduction benefits by excluding sex offenders, as a group, from earning goodtime eligibilty.  Instead, the 1991 amendment **broadened** the class of prisoners who could earn goodtime benefits.  Not only did the 1991 amendment fail to deny all sex offenders the right to earn goodtime, but it expanded the class of goodtime eligibles to include inmates sentenced to longer prison terms for **presumably more serious crimes.** In addition, the 1991 amendment preserved intact the prior provision denying Class I earning status only to those inmates convicted of sexual abuse of a child under 17, see Ala. Code 1975 § 14-9-41 (e) (Supp. 1992), but not other sex offenders.  This statement clearly varifies the fact that, the alabama department of corrections class- ifications, are in no position to determine what constitutes a serious offense.  Their is no justification of awarding goodtime credits to child sexual predators, while denying other criminal offenses with non violent crimes and property crimes, but with more time (over 15 years). The judicial branch of the government clearly was in the best position to determine what inmate receives class I goodtime and any other class the court deemed necessary to earn time deductions.  But this was plainly "stripped" from the courts when legislature illegally amended 10 years to 15 years (subsection (e) ), because, it is clear that, if an inmate is sentenced to more than (15) years, then it makes no diff- erent how he conducts himself in ways of rehabilitation, because he will earn "no" reductions from his sentence.  However, if the inmate rapes some small child, or shoots some persons leg off, and don't receive over (15) years, this inmate can earn time reductions off his sentence... no matter how serious this offense is.

"Hilsabeck", was decided only after three years after the adoption of "Acts 80-446".  This case was decided on the "thought" of judicial interpretation of the statute without receiving legislature journals or "Bills".  That case was decided in favor of the defendants by

27

a 4 to 3 decision.  Twentyseven (27) years later, it can be said
that the dissented opinion was correct.......

**DISSENT BY: ADAMS, FAULKNER AND JONES:**

**ADAMS, JUSTICE (DISSENTING),**
I respectfully dissent.  I disagree with the majority's holding that
Article IV, 45 of the alabama constitution has not been violated in
this case.  As the majority correctly points out, §45 was enacted in
order to protect against the legislature's being misled by a title
of a bill which does not clearly express its subject.  After reading
the entire title of the bill involved in this case, and not just the
first three clauses, which are the focus of the majority opinion, one
could reasonably believe that all inmates would be classified so as to
receive some degrees of earned deductions from sentence except habitual
offenders, who are the only group of inmates specifically referred to
in the title as not being eligible for earned deductions.  Thus, a
legislature could have read only the title of the bill and believed he
was voting for a  bill which allowed correctional incentive time for
all inmates except habitual offenders, when in effect he was voting for
a bill which denied the majority of inmates the benefits of correctional
incentive time.  Evidence in this case indicates that a majority of
alabama's inmates have a sentence of 10 years or more.  This is the
very danger that § 45 was enacted to guard against.  As this court st-
ated in Alabama Ed. Ass'n V. Board of Trustees of the university of
alabama, 374 so 2d 258 (1979):

> **To require the reading the entire bill so as to
> discover its pertinent provisions would clearly
> fly in the teeth of the requirement of § 45.**

Id. at 262, without reading the text of the bill and only reading the
title, one would never know that the bill effectively allows corr-
ectional incentive time to only a minority of inmates now serving time
in prison.


I must also dissent from the majority's holding that Article IV § 61,
of the alabama constitution was not violated.  The purpose of the act
stated  succinctly, is to establish a system whereby inmates received
earned deductions from sentences.  The original bill in the senate
would have achieved that result, as those inmates with sentences of

ten (10) or more years could have earned incentive time in both class II and class III, and would have been ineligible only from attaining class I status.  The act as passed with amendment, however, rather than providing each inmates with the opportunity to earn incentive time, denied those inmates with sentences of ten or more years the opportunity to earn any deductions from their sentences.  It is clear to me from a reading of the entire title that the purpose of the act was to establish a system for the measurement and award of correctional incentive time, and to exclude only habitual offenders from earning such incentive time.  I fail to see "how a bill can be amended to so drastically alter its effect on a majority of the state's inmates, without being any change in its original purpose.

"A similiar suit was filed against the Department of Corrections and the Commissioner pretaining to prison overcrowding:Newman V. Graddick, 740 F. 2d 1513 (1984): **(Let it be noted at the time of the adoption of acts 80-446, Graddick was also the alabama Attorney General).** The court stated in Newman that; there is substantial credible evidence that the defendant Graddick has attempted to influence the alabama board of pardons and paroles to follow a very restrictive policy in granting paroles and that that policy has been one of the most significant factors in creating the currently existing overcrowding conditions.  There is no evidence to the contrary.  The Attorney General has **publicly** and often expressed strong opposition to the release of prisoners before the expiration of their terms.  His public utterances thereon have been widespread and repeated one might think that he completely disagrees with the state of alabama pardons and parole board and the laws which justify the existence thereof. Defendant Graddick has probably substantially increased the cost to the tax payers of operating the prison system.........

**"AND FURTHER,,,THE PLAINTIFF(S) SAYS NAUGHT.**

29

In McKUNE v. LILE (2002) 536 US 24, 153 L ED 2d 47, 122 S Ct 2017,
it was reported that sex offenders are a <u>serious</u> threat in this
nation. In 1995, an estimated 355,000 rapes and sexual assaults
occured nationwide. U. S. Dept. of Justice, Bureau of Justice St-
atristics, Sex Offense and offenders 1 (1997) (hereinafter Sex Off-
enses); U. S. Dept. of Justice, Federal Bureau of Investigation,
Crime in the United States, 1999, Uniform Crime Reports 24 (200).
Between 1980 and 1994, the population of imprisoned sex offenders
increased at a faster rate than for any other category of violent
crime. See Sex Offenses 18. As in the present case, the victims
of sexual assault are most often juveniles. In 1995, for instance,
a majority of reported forcible sexual offenses were committed ag=
ainst persons under 18 years of age. University of New Hampshire,
Crimes Against Children Research Center, Fact Sheet 5; Sex Offenses
24. Nearly 4 in 10 imprisoned violent sex offenders said their vic-
tims were 12 or under. Id., at iii. When convicted sex offenders
reenter society, they are much more likely than any other type of
offender to be rearrested for a new rape or sexual assault. See id.,
at 27; U.S. Dept. of Justice, Bureau of Justice Statistics, Recid-
ivism of Prisoners Released in 1983, p 6 (1997). States thus have a
vital interest in rehabilitating convicted sex offenders.


## LAW MAKERS HAVE CREATED A STATEWIDE DANGER IN SUBSECTION (e)

In Maxwell v. School Dist. of Philadelphia (53 F. Supp. 2d 787
E.D. Pa. 1999), The rule that the state has no responsibility to
protect its citizens from violent acts of private parties finds a
secon execption when there has been a state created danger. If a
state actor creates a danger which harms an individual(s) or render
him or her more vulnerable to that danger, although the state actor
does not actually harm the individual the state actor may be held
to have violated the due process clause. In McKune, supra, it was
stated that "if inmates know society will not punish them for their
past offenses, they may be left with the false impression that soc-
iety does not consider those crimes to be serious ones. Readers,
PLEASE READ THE FOLLOWING VERY CAREFULLY!!!!!!!.

30

## A BRIEF VIEW OF THE "EVIL" PERPETRATED BY LEGISLATURE

Despite of the ruling in "Hilsabeck", there is an evil associated with the passage of 80-446 that is relaxed with sex offenders,and dangerous violent offenders who commit assaults where an organ is lost as a result of this assault.  These offenses can receive time deductions as long as the accused has 15 years or under.  We are not asserting that "Act 80-446 is violating Article IV §45 of the Alabama Constitution, nor are we saying that "Act 80-446 is viola- ting Article IV §61 of the Alabama Constitution.  Act 80-446 is go- od law. But, given the history of Act 80-446, the courts found that there were at least three versions of this act.  Ultimately, the "Cook Substitute" which contained the "McDonald Amendment" prevailed to the exclusion of the original bill and the substitute offered by the Judiciary Committee.(Journal of the house, May 1980, pp. 2196- 2198.

The legislative history of the "Act" reveals that each Senate vers- ion contained provisions designed to restrict the amount of Alabama Correctional Incentive Time Deductions(Known as CIT) availible to specific groups of inmates. this clearly proves that, inmates other than life was to be afforded some type of deductions off their sen- tences, but not all inmates could be afforded Class 1 based on the nature of their offense, which left the Judicial Branch of the Gov- ernment to decide because they are in the best position to give a recomendation than any other branch of government.


## THE CODIFICATION OF SUBSECTION (e) is unconstitutional

When "Act 80-446" was codified into §14-9-41 subsection (e), that subsection conficted with the unambigious langauge enacted by the legislature of Alabama. The meaning of CODIFIED...A LAW THAT PURPORTS TO BE EXHAUSTIVE IN RESTATING THE WHOLE OF THE LAW ON A PARTICULAR TOPIC, INCLUDING PRIOR CASELAW AS WELL AS LEGISLATIVE PROVISIONS. The meaning of the word PURPORT...TO PROFESS OR CLAIM FALSELY.... TO SEEM TO BE.  Now lets look at the general law of the "Act 80-446,

### BE IT ENACTED BY THE LEGISLATURE OF ALABAMA

Section 1. This act shall be known as the "Alabama Correctional Incentive Time Act".

Section 2. Each prisoner who shall hereafter be convicted of any
offense against the laws of the State of Alabama and is confined,
in execution of the judgment or sentence upon **any conviction**, in
the penitentiary or at hard labor for the county or in any muni-
cipal jail for a definite or indeterminate term, **other than for
life**, whose record of **conduct** shows that he has faithfully observed
the rules for a period of time specified by this act may be entitled
to earn a deduction from the term of his sentence as follows:

Now, from the simple reading of this legislative act, it is very
easily understood that the legislature intended for every person,
hereafter that is convicted of any offense in the state of alabama
other than for life, can receive some deduction off their sentence
if their conduct and ability to follow the rules warrant this.  Now,
when this legislative Act was **CODIFIED** into §14-9-41 (e), this sub-
section went into conflict with the general law because subsection
(e) not only restricted life sentences from earning deductions, but
restricted those who have over 10 years, those who were convicted of
a Class-A felony too. Earlier on, it was said that the original act,
cooks subsitute, and a few more senate bills were similiar to this
act in that it restricted a specific groups of inmates from receiv-
ing **class 1** earning status.  Now, this **"purported" "McDonald Amend-
ment"** to the first paragraph in subsection (e) of §14-9-41, restricted
almost all inmates "hereafter" that enter alabama prison from earn-
ing **any deductions** from their sentence, no matter if it's life, 10
or more years, class-A felony none of these people are eligible.
The reason that "THE McDONALD AMENDMENT" is PURPORTED (false) is
because, (IF) the legislature passed that version of subsection (e)
in 1980 stating that "provided however no person may receive the
benefits of correctional incentive time if he or she has been con-
victed of a class-A felony or has been sentenced to life, or death,
or who has received a sentence for more than 10 years....if this
passage were true...then why raise 10 years to 15 years in 1991?
It is plain to see, this does not have a penalogicial purpose be-
cause, if no person sentenced to over 10 years can receive no ded-
uction off their sentence....this means over 15 over 20 over 30 ect.
The 1991 "Amendment is clearly a "Sham" because the court system and
the attorney general's office thinks that everyone other than "Life"
are receiving some type of reduction off their sentences. (Please see
attached exhibit of the Tuscaloosa, Northport, West Alabama Newspaper
dated Febrary 2007).  Here, the office of the attorney general is

32

talking about convicted criminal "Wayne Kyzer". This criminal was
sentenced to two consecutive life sentences, and 10,000 years in
prison. Now, the attorney general office knows an inmate in alabama
cannot receive reduction off a life sentence, because this is what
the legislature enacted, however, "Kyzer" can receive incentive de-
duction off the sentence of 10,000 years. This is yet another truth,
that the legislature intended that everyone other than life was to
receive some type of incentive deduction off their sentence, if their
behavior warranted it. And, it further proves that the "McDONALD
AMENDMENT" IS IN CONFLICT WITH LEGISLATIVE LAW, and is an outright
"SHAM". (IF) the legislature passed the codification of Act 80-446,
by way of §14-9-41 subsection (e) with the "McDonald Amendment" placed
in the first paragraph of subsection (e), then, it is unconstitutional
in that, it cleary conflicts with the purpose of the Law.

## SUBSECTION(e) SHOULD HAVE READ AS FOLLOWS:

(IF) the legislature passed the codified version of 80-446 by way
of §14-9-41, to make sense, it should have read as follows: Provided
however, no person may receive the benefits of Class 1 if he or she
has been convicted of a Class-A or has been sentenced to life, or
death, or who has received a sentence for more than 10 years.... The
Attorney General's Office and the Courts around the state of Alabama,
seems to think this is the correct version, otherwise, they would
readily know, that almost no one in Alabama prison are receiving de-
ductions off their sentences but "SEX OFFENDERS", and "VIOLENT ASS-
AULT" inmates because, most of them are in the class-B or class-C
felony range. (IF) THE legislature passed the codified version of
80-446 by way of §14-9-41, to make sense, the "McDonald Amendment"
should have been placed in the last paragraph of subsection (e), whi-
ch should have read: No person may receive the benefits of correc-
tional incentive time if he are she has been convicted of a crime
involving the perpetration of sexual abuse upon the person of a child
under the age of 17 years. No person may receive the benefits of
correctional incentive time if he or she been convicted of an assault
where the victims of such assault suffered the permanent loss or use
or permanent partial loss or use of any bodily organ or appendage.
If this is not the correct way the law was intended to be, then,
every child, woman, and vulnerable citizen who is subject to a vicious
assault better leave this state, because, legislature allows them

33

to get lighter sentences, and the benefits of deductions off their lighter sentences. This is all because of the "PURPORTED McDONALD AMENDMENT" TO SUBSECTION (e) codified through §14-9-41. The general intendment of 80-446 doesn't matter anymore...subsection (e) is the law in Alabama. "Steal a bike, or get caught with 10.00 worth of "crack", alabama will spend 100,000 dollars prosecuting, then spend an additional 100,000 dollars housing you in prison because, the ac-cused was sentenced to over 15 years, so he will not receive any de-ductions off his sentence, no matter how his behavior is. But, rape a child, or shoot some old person leg off, the accused will get a much lighter sentence, with the benefit of receiving deduction off their sentences. This is the truth of Alabama law makers.

## A VIEW OF ALABAMA'S SEX OFFENSE

<u>Rape 1st degree</u>  Class-A felony invovles a child under 12 years old.
<u>Sodomy 1st  degree</u> Class -A felony involving a child under 12 years old.
<u>SEXUAL TORTURE 1st degree</u> Class-A felony, child under 12 years old.

These are the only offenses that are class a felonies involving a child. The rest of the sex offenses you can receive reduction off your sentences. Even these three offenses will come under Judicial scuntiny because, (IF) the legislature passed §14-9-41(e) with the "McDonald Amendment" "purported" to be inserted in it's rightful paragraph, then all class-A felonies starts at 10 years and these prisoners will have a legitimate argument because, it's clear that the department of corrections deny prisoners incentive goodtime based soley on the length of their sentences and not the seriousness of their offense, otherwise, how can a person receive deductions off his sentence if he violently shhots a person's arm off? The legislature "purportedly", raised 10 years to 15 years in "subsection (e) in 1991. So a first degree rape starts at 10, so if he pleads to 10 years, he eligible for time reductions because he has under 10 years.  The legislature must not have "studied" preexisting law when they "pur ported to have passed "80-446" and then "codified it into the "McDonald Amendment" in §14-9-41 subsection (e).

1. The plaintiffs _____ and other prisoners similarly
situated are being denied "Equal Protection" and "Due Process" under
the united states constitution.


(A) The Alabama department of corrections, commissioner(s) and Wardens
are not following legislative law with respect to earning incentive
goodtime credits.


(B) Subsection (e) of the code of alabama relating to the issuing of
goodtime incentive credits serves no penological purpose".


Acts No: 80-446 was implentmented by the legislature of alabama to
allow each inmate to receive a reduction from their sentence based on
the inmates conduct.  This act also provided the department of correc-
tions to classify a inmate according to his/her behavior", By establi-
shing this system each inmate was to be classified in accord to his/her
behavior.....THE BEHAVIOR CLASSIFICATION SYSTEM".


<u>Acts 80-446 reads</u>:
pernament part:- To establish the " ALABAMA CORRECTIONAL INCENTIVE TIME
ACT", to provide for earned deductions from penitentiary and hard
labor sentences and to establish certain criteria therefor; to create
classifications for measurement of such deductions and eligibility there-
for.  This act provided that habitual offenders <u>SHALL</u> not be eligible
for any deductions from sentence.


<u>The classification system</u>.- The classification system that was put in
place by the commissioner of the department of corrections allowed
prisoners to be placed in four classification classes.  This system
also allowed each prisoners to receive a deduction from their sentence
based on, work pratice, behavior and institutional rules of conduct.
This behavior system classified prisoners in four catorgories and set
out a criteria they must follow in order to receive a deduction from
their sentence.


Class 1. is set aside for those prisoners who are considered to be
trustworthy in every respect and who, by virtue of their work habits,

35

conduct and attitude of cooperation have proven their trustworthiness.
An example of a class1 inmate would be one who could work without
constant supervision by a security officer. [ class1 inmates receives
75 days for each 30 days actually served while the prisoner is classi-
fied as a class1 prisoner.]

Class 2. Is that category of prisoners whose jobs will be under the
supervision of a correctional officer or employee at all times.  Any
inmate <u>shall</u> remain in this classification for a minimum period of six
months before being eligible for class 1.  Class 2 prisoners receives
forty days for each 30 days actually served while the prisoner is a class
2 prisoner.

Class 3. Is for prisoners with special assignments. They are not to
receive any of the privileges of class 1 and 2 inmates.  Any inmate <u>shall</u>
remain in this classification for a minimum period of three months before
being eligible for class 2.[ Class 3 prisoners receives twenty days for
each 30 days actually served while the prisoner is a class 3 prisoner.

Class 4. Is for prisoners not yet classified and for those who are able
to work, but refuses, or who commit disciplinary infractions of such a
nature which do not warrant a higher classification, or inmates who do
not abide by the rules of the institution.  Inmates who are classified in
this earning class receives no correctional incentive time.  This class
is generally referred to as " flat time" or " day-for-day" any inmate
<u>shall</u> remain in this classification for a minimum period of 30 days before
being eligible for class 3.

<u>SECURITY LEVEL</u>: <u>defines a prisoner institutional placement.</u>

<u>CUSTODY/CLASSIFICATION</u>: <u>is synonmous with each other.</u>
Prisoners in alabama are classified into three custody classifications,
1. medimum. 2. minimum. 3. community.  The numerical numbers behind a
inmates custody determines his earning statutes, this numerical number
also deterines the maximum deductions from his sentence throughout his
sentence.

when a prisoner first enters the prison system, that prisoner is not
yet classified.  When the prisoner has been classified, that prisoner
will be classified as a class 1, 2, or three prisoner.  This classifi-
cation classifies a inmate as a medium,minimum or a community custody
prisoner.  When the prisoner receives his classification a numerical
number is placed beside that prisoners custody, that number represents
the class that prisoner is serving his sentence in, and the amount of
goodtime incentive credits that prison can earn while in that class.
if, the maximum amount of incentive credits a prisoner can earn is 40
days for each 30 days actually served that prisoner will have the
numerical number 2 placed beside his custody classification.[eample
med-2] when a prisoner has the number 2 placed besides his custody clas-
sification, that prisoner will serve the remainder of his sentence as
a class 2 prisoner for the deduction of goodtime incentive credits.
when this same inmate is moved to a less restrictive institution to
include work release his custody will read community-2...........
when a prisoner has been sentence to more than 15 years in the state
of alabama prison system, that prisoner will be automatically be classi-
fied as a class 4 prisoner based soley on subsection (e), and not so
classified in accord with any of the factors governing class 4 prisoners.
These prisoners will have the numerical number 9 placed besides that
prisoners custody.[example med-9] the department of corrections has
stated in prior cases, that the number 9 represents that class of
prisoners who are prohibited from earning a deductions from their sen-
tence.  When this prisoner is placed in community custody his custody
will change from med-9 to community-9,. this number 9 in reality is a
4 [class 4]. The department of corrections classification team could
have easily placed a 4 beside a prisoners custody when they are not
earning goodtime incentives, but this would have been easily discovered
and raised doubts as to a prisoners custody and legislature intent in
stating that each and every inmate has to be classified in a earning
class other than 4.
80-446 sets out criteria for each and every inmate to be classifiied
in accordance with its provisions, however, subsection (e) automati-
cally classifies a prisoner as a class 4 prisoner based soley on the
lenght of that prisoners sentence and no penological means. The de-

partment of corrections classification team and specialist are class-
ifying prisioners as class 4 prisoners based soley on the length of
their sentence, but are using the numerical (9) to systematically con-
fuse the prisoner in believing that he/she are in someother class other
than class 4.  Because the prisoner knows that class 4 is for inmates
not yet classified, and inmates who can work but refuse to, and inmates
with a constant disciplanary infraction history.  So, if the classifi-
cation specialist were to put the numerical (4) behind his security lev-
el, the inmate could readily argue that, he doesn't fit the definitionn
of that category.  **(This is the analogy of the illusionary numerical
number (9) ):** The department of corrections has (4) class(s) of inmates.
The legislature intended for inmates, (other than life, and habitual
offenders) to stay in class (4) for at least (30) days before moving
to a higer class (based on behavior ).  However, when subsection (e)
was illegally amended to §14-9-41, the wording of that subsection (e)
made inmates, with over 15 years, stay in class (4), regardless of how
well they adjust to institutional rules.  Ironically the **a**lphbet (e) is
the fifth (5) letter in the alphabet.  So, the department of corrections
classification department, literally read class (4) into the illegally
amended subsection (e), thus, 4+5=9.  So, if a prisoner has over 15
years, he/she will be class as follows: Minimum (9), Medium (9), and
Maximum (9).  The Department of correction will allow a minimum(9)
inmate to go to a less restrictive facility, but because of that num-
erical number (9), this prisoner is categorically denied the benefits
of that less restrictive custody class, through denying him/her the
benefits of earning a time deduction from his/her sentence.
**Subsection (e) is also against Act 80-446 pretaining to Inmate class-
ification:** When the state of alabama adopted, implemented and/or pro-
mulgated the McDonald amendment, (known as the cooks subsitute), am-
ending subsection (e) from ten (10) years to reflect fifteen (15) years
, this amendment directly violated, <u>the Alabama Constitution 1901 Art-
icle I, section §61,</u> because the amendment allowed serious and

38

habitual felony offenders, (the particular specific class of prisoners
in which legislators for the state of alabama purposely intended to
be prohibited from earning anytime deductions) from their sentences.
This action went against the stated intendment of alabama's legis-
lative intent of Act 80-446. And, the alabama legislature mandated
the commissioner of the (ADOC), ninety (90) days, after may 19, 1980,
to establish and publish an appropriate directives certain criteria
**NOT IN CONFLICT WITH ARTICLE FOR CLASS I, II III AND IV PRISONERS**
**CLASSIFICATION.** Alabama legislature further stated that, such clas-
sification shall encompass consideration of the prisoner's behavior
and discipline, and work practices and job responsibilities.
The Commissioner for the department of corrections, established and
published the **Alabama Department Of Corrections-Administrative reg-**
**ulation (#400), Inmate Classification, and #427**(Correctional Incentive
Time Deductions), in which such administrative regulations, as pub-
lished and established by the commissioner of the ADOC established
inmate custody levels and security levels, that deviated from the
inmate behavior classification system as adopted by alabama legis-
lature intent for inmates to be classified soley on the basis of
their behavior, thus providing for an inmate to be in one class, how-
ever, placed within another class, for the sole purpose of working,
but categorically denying that prisoner from receiving the included
benefits of time deduction from their sentence based on his behavior
resulting from his/her attitude towards working while incarcerated.
Before the implementation of 80-446, it was readily apparent what in-
mate had a serious crime, based on his/her sentence(please see the
classification manual dealing wit serious offenses).  Now, because of
Act 80-446, and the habitual felony sentencing enhancement act, a
prisoner can receive 40 or 50 years for stealing a bike and have two
prior none violent felonies that wasn't serious offenses.  These acts
and illegal amendments, has caused a class of inmates to be punished
severly for crimes that are not serious crime, while, giving child
molestors and baby rapers goodtime off their sentences as long as the
sentence is not over 15 years, and the offense is not class "A". So, it
should be considered impossible to deny a prisoner deductions from his
sentence based on the length of his sentence, and it should be equally
impossible to deny an inmate a deduction from his sentence based on
the seriousness of his offense, when the ADOC ALLOWS inmate with "SEX
OFFENSES", deductions from sentence as long as the sentence is 15 years
or less, no matter how serious the offense is.

80-446, prohibited prisoners from earning the benefits of Incentive goodtime who have been convicted of a class "A" felony, prohibited those who are sentenced as a habitual felony offender, and those who are sentenced to life or death. **SUBSECTION (e)**, prohibited those who has received a sentence of more than 15 years. The court also stated in "**HILSABECK**", that it can be reasonable concluded that, the legislature also prohibited prisoners who has received a sentence in the class "A" range: NO PERSON MAY BE PLACED IN CLASS 1 IF HE/SHE HAS BEEN CONVICTED OF AN ASSAULT WHERE THE VICTIM OF SUCH ASSAULT SUFFERED THE PERMANENT LOSS OR USE OR PERMANENT PARTIAL LOSS OR USE OF ANY BODILY ORGAN OR APPENDAGE. NO PERSON MAY BE PLACED IN CLASS 1 IF HE/SHE HAS BEEN CONVICTED OF A CRIME INVOLVING THE PERPETRATION OF SEXUAL ABUSE UPON THE PERSON OF A CHILD UNDER THE AGE OF 17 YEARS.

Before 1980, prisoners in the ADOC who was sentenced to 10 years or more, could not receive goodtime credits. Prisoners who was convicted of a class "A" felony could not receive goodtime credits because, the legislature deemed that their crime was to serious to merit beneficial treatment, the courts also stated in prior rulings that the legislature also concluded that anyone who receives a sentences in the class "A" felony range, could not earn goodtime credits...a class "A" felony started at 10 years.

In 1980, acts 80-446, the habitual felony offender act was passed by the alabama legislature. "ALABAMA INCENTIVE GOODTIME ACT" , this act prohibited specifically habitual felony offenders from receiving goodtime credits. When this act was passed, prisoners who received a sentence of 10 years or more (subsection (e) ), was prohibited from earning goodtime. Habitual offenders were precluded by both the act, and subsection (e) because, the minimum sentence a prisoner could receive as a habitual offender, was 15 years. In 1991, ten years after passing act 80-446 (habitual felony offender act), the alabama prison system, was dangerously overcrowded... as it is today. In 1991, the legislature amended subsection (e) from 10 years to 15 years. This amendment allowed those habitual offenders to receive goodtime credits. This amendment allowed habitual offenders and sexual preditors (serious offenders) to be released from prison.

This amendment also allowed prisoners who were sentenced in the class "A" felony range to receive incentive goodtime credits against legislature intent.

Warden Nagle testified in a similar suit by "Hilsebeck" and "Thorton", that prisoners are denied by the seriousness of their offense, or the lenth of their sentence.  These two standards has been drastically abused and applied selectively and against legislature intent and not in acc_ ord with the code of alabama, and denies prisoners equal protection and due process of law.

If a prisoner receives a sentence of (15) years or less for sexual abuse of a child, or rape II, sodomy II, assault 1st, assault 2nd, where the victim lose a bodily organ, he/she (prisoner) can receive goodtime, however, not in class 1.  Are these crimes not serious?

If a sexual predator commits (50) crimes of rape and repeatly commit these crimes for the remainder of his life, as long as he receives a sentence of (15) years or less, he/she can receive goodtime credite.

**INMATES CLASSIFICATION MANUAL DEFINES SERIOUS OFFENSES (PLEASE SEE THE ATTACHED EXHIBITS).**

When 80-446 was passed by the alabama legislature, its purpose was to give each prisoner a greater amount of goodtime he/she can earn based on his/her behavior.  However, the ADOC has implemented a double standard to deny inmates these benefits.  Subsection (e) prohibits prisoners who are sentenced to (15) years or more, without any penological reason, thus, creating another sub-class of inmates the legislature did not intended when passing 80-446.  Subsection (e), also grants goodtime to serious offenders and sexual offenders, but denies them to be placed in class 1 earning statute, and also states a reason as to why they cannot be placed in class 1.  15 years in subsection (e) serves no penological reason.

### SERIOUS OFFENSES   CLASS "A" FELONY

If a person commits a crime of robbery 1st degree, with or without serious injury, then, he/she is a class "A" felony.  If that person robs another person and represent himself in the manner as he/she has a weapon or a dangerous instrument, but does not show or use it, that person is denied goodtime because the seriousness of his/her offense.

THE DEFINITION OF THE WORD "MAY", IS DEFINED...TO ALLOW OR TO PERMIT.
THE DEFINITION OF THE WORD "SHALL" IS DEFINED.... TO COMMAND.

"MAY", used in subsection (e), lacked substantial justification that
awarding some inmates correctional incentive time, while denying oth-
ers with like offenses, but more time.  Subsection (e) states in the
pertinent part: Provided however, no person MAY RECEIVE THE BENEFITS
OF CORRECTIONAL INCENTIVES TIME IF HE OR SHE HAS BEEN CONVICTED OF
A CLASS-A FELONY OR HAS BEEN SENTENCED TO LIFE, OR DEATH, OR WHO HAS
RECEIVED A SENTENCED FOR MORE THAN 15 YEARS..... The word MAY used
here in subsection (e), is not used as an effort to effectuate legis-
lative intent of 80-446 (CIT), but rather to usurp it.  The legislature,
in constructing 80-446 (CIT), used mandatory langauge in its purp-
ose of constructing that statute (shall).  The word MAY is a dis-
cretionary word used to give one in authority, the power or right to
act in certain circumstances.  However, when Act 80-446 (CIT) was
written, the mandatory language of that statute (80-446 CIT), did not
leave the commissioner of the department of corrections power or the
authority to chnge this act....only to enforce the act.  Further,
subsection (e) states in pertinent part: NO PERSON MAY BE PLACED IN
CLASS-1 if he/she has been convicted of assualt...here again, the
word MAY IS used to give the department of correction, by authority
of the commissioner, discretionary power to discriminate against in-
mates who should be earning (CIT).  In act 80-446, the legislature
invested in the commissioner the power to;AUTHORIZE THE COMMISSIONER
OF THE DEPARTMENT OF CORRECTIONS TO RESTORE CERTAIN PORTIONS OF SUCH
DEDUCTIONS LOST...This plain statement clearly proves that the leg-
islature intended for every inmate, except those who have a life
sentence, and habitual offenders not to earn correctional incentive
time.  This is not enforcing legislature intent, this is clearly a
usurpation of the law.  The commissioner of the department of corr-
ection has literally abolished the act of 80-446 (CIT), and created
a body of law other than what the law makers of this state intended,
thereby, creating a class of inmates other than class 1,2,3, and 4
inmates.  These inmates are not classified under legislative standard,
of act 80-446 (CIT), but by an invisible set of laws constructed by
a group of rogue politicians for the purpose of industrializing in-
mates to force free labor under a false color of law.

In Closing, we inmates knows that, a government is under no obligation to provide a benefit to prisoners.  So, why would the government give benefits to what is determined the most serious offense of all crimes (sexual offenses), (violent assaults) to this group of prisoners, And deny benefits to those whose crimes are less serious.  This does not excuse its invidious discrimination among potential recipients after the decision has been reached to establish the benefits.  Tolerance for discretion in the granting of benefits does not imply tolerance for their discretionary distribution.  The state of alabama has in fact, denied every prisoner, not including life, the equal protection of the law guaranteed by the 14th amendment of the United States Constitution.

SINCERELY WRITTEN BY PRISONERS WHO HAS BEEN IMPRISONED FOR OVER A QUARTER OF A CENTURY AND NEVER EARNED A SINGLE DAY OFF THEIR SEN= TENCES EVEN THOUGH THEY EXEMPLIFIED GOOD BEHAVIOR AND ABIDED BY ALL RULES AND REGULATION.  ALSO, THIS IS BY INMATES WHO HAVE BEEN IM= PRISONED FOR OVER 20 YEARS AND NO ONE WAS HURT IN THEIR CRIMES, AND WAS ALSO MADE TO WORK WITHOUT ANY DEDUCTIONS OFF THEIR SENTENCES.

## JURISDICTION

All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by citizens, and shall be subject to like punishment, penalties, taxes, licenses , and exactions of every kind and to no other.

Every person, who, under the color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or inmunities secured by the constitution and laws, shall be liable to the party injuried in an action at law, suit in equity, or other proper proceedings for redress.

Smith correctly argues however, that a prisoner who is not sentenced to labor, retains his thirteenth (13th) amendment rights. Watson V. Graves 909 F. 2d 1549 (5th cir 1990) hams claims, and defendants do not dispute, that his sentence included confinement and fine, but not include labor.  Thus, the gravemen of hams complaint is that the service he performed while incarcerated was not voluntary.

Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted shall exist within the United States, or any place subject to their jurisdiction see: Harris V. Ashby, may 29, 2001 U.S. Const. Amend XIII § 1. Defendant(s) argue that harris's claim falls by his own admission because the service was voluntary.  The court agrees.  First, compelling an inmate  to work without pay is not unconstitutional because the thirteenth amendment specifically permits involuntary servitude as punishment after a crime.  Murray V. Miss. Dept. of Corr. 911 F. 2d 1167 (5th cir. 1990).

The equal protection clause of the fourteenth amendment is a mandate that all persons similary situated be treated alike. City of Cleburne living Ctr. 473 U.S. 432, 87 L. ed 2d 313.

The petitioner(s) contends that they are being subjected to numerous civil rights violations while confined in the Alabama Department of Corrections, specifically, the denial of goodtime credits: Equal protection of the law (federal constitution) The Alabama Const. does not have a equal protection law.  And involuntary servitude.  The plaintiff request immediately declaratory and injunctive relief.

The petitioner is being force to work without compensation and a reduction from his sentence alike similary inmates who receive such reduction in violation of the thirteenth amendment prohibition against involuntary servitude and 14th fourteenth amendment to equal protection of law.  The actions for such treatment subjected him to cruel and unusual punishment (amendment 8).  This cause of action by the defendants constitutes "prison slavery".  And Richard Allen as the policy maker, is responsible for the alleged Const. violations.

The petitioner Cedric Allen Smith argues that the defendants distinguished between two groups of similary situated inmates based on the length of their sentencing, and that this distinction is not rationally related to any legitimate state purpose see:Stefanoff v. Hays County, 154 F. 3d 523.

The equal protection clause of the fourteeth amendment requires essentially that all persons similary situated be treated alike. see: Rolf v. City of San Antonio, 77 F. 3d 823.  In order to establish an equal protection claim, stefanoff must prove (1) that hasting created two or more classifications of similarly situated prisoners that were treated differently.  see: Johnson v. Rodriquez, 110 F. 3d 299, 139 L. ed 2d 400, and (2) that the classification had no rational relation to any legitimate governmental objective.

The petitioner Smith also argues that he has been submitted to work for private property individuals in violation of the free labor act. Secondly, the petitioner(s) is automatic placed in class IV based on the length of his sentence which is 20 years for a non violent crimes. Class IV states: Therefore, the petitioner has been specifically classified in shouldn't be expected to work.  This classification is unconstitutional against legislative intent.

Alabama incentive good time act is clear and unambiguous in its provisions.  Uncertainty is injected into the act only when its provision are attempted to be broadened or expanded beyond the language of the act.

45

## CONSLUSION

**WHEREFORE, ALL PREMISES BEING HEREBY CONSIDERED,**

the Plaintiff, pro se, hereby prays, for this Honorable Court to grant the Temporary

Restraining Order and/or in the alternative Preliminary Injunctive Relief, as filed,

purusnt to the Federal Rules Of Court-Federal Rule (Fed. R. Civ. P.), Rule 65,

along with any and all other equitable, in which is thereby deemed appropriate,

proper and necessary, by this Court.

Respectfully Submitted,

Cedric Allan Smith

Cedric Smith
**Plaintiff, pro se,**

## CERTIFICATE OF SERVICE

I do hereby certify that on this 9th day of April, 2007, I have served a

copy of the foregoing **Memorandum Of Law And Brief In Support Of The**

**Plaintiff's Application For Temporary Restraining Order And/Or In The**

**Alternative An Application For Preliminary Order,** by placing an exact copy

of same within the Internal Inmate Mailing System, at G.K. Fountain Correctional

Center, Fountain 3800, Atmore, Alabama 36503-3800 (United States Mail),

postage pre-paid First-Class and properly addressed, as hereby, follows:

Honorable Troy King
Honorable Troy King
Attorney General
State Of Alabama
Assistant Attorney General
11 South Union Street
Montgomery, Alabama  36130

Honorable Charles R. Niven
United States (U.S.) Attorney General
Middle District Of Alabama,
Post Office Box 197
Montgomery, Alabama 36101-0197

Honorable Richard Frank Allen
Alabama Department Of Corrections (A.D.O.C.)
301 South Ripley Street
Post Office Box 301501
Montgomery, Alabama 36130-1501

                    Respectfully Submitted,

                    Cedric Allen Smith
                    Mr. Cedric Smith, #155509,
                    G.K. Fountain Correctional Center
                    Fountain 3800
                    Atmore, Alabama  36503-3800